# EXHIBIT A-3

FILED
10/3/2024 2:10 PM
District Clerk
Hays County, Texas

NO. _____24-2718_____

| | | |
|---|---|---|
| DANIEL FRIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | IN THE DISTRICT COURT OF |
| v. | ) | |
| | ) | HAYS COUNTY, TEXAS |
| 3M COMPANY (f/k/a Minnesota Mining and | ) | |
| Manufacturing, Co.); | ) | _____ DISTRICT |
| AGC CHEMICAL AMERICAS, INC.; | ) | |
| AGC INC. F/K/A ASAHI GLASS CO.; | ) | |
| ARCHROMA US, INC.; | ) | |
| ARKEMA INC.; | ) | |
| BASF CORPORATION; | ) | |
| BUCKEYE FIRE EQUIPMENT COMPANY; | ) | |
| CARRIER GLOBAL CORPORATION; | ) | |
| CHEMDESIGN PRODUCTS, INC.; | ) | |
| CHEMGUARD, INC.; | ) | |
| CHEMICALS INCORPORATED; | ) | |
| CHUBB FIRE, LTD.; | ) | |
| CLARIANT CORP.; | ) | |
| CORTEVA, INC.; | ) | |
| DEEPWATER CHEMICALS, INC.; | ) | |
| DOE DEFENDANTS, JOHN 1-49; | ) | |
| DUPONT DE NEMOURS, INC.; | ) | |
| DYNAX CORP.; | ) | |
| E.I. DU PONT DE NEMOURS & COMPANY; | ) | |
| KIDDE PLC INC.; | ) | |
| NATIONAL FOAM, INC.; | ) | |
| NATION FORD CHEMICAL COMPANY; | ) | |
| RAYTHEON TECHNOLOGIES | ) | |
| CORPORATION   (f/k/a United Technologies | ) | |
| Corporation); | ) | |
| THE CHEMOURS COMPANY; | ) | |
| THE CHEMOURS COMPANY FC, LLC; | ) | |
| TYCO FIRE PRODUCTS, LP; | ) | |
| UTC FIRE & SECURITY AMERICAS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

1

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Daniel Frias ("Plaintiff"), by and through undersigned counsel, brings this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), AGC Chemical Americas, Inc., Archroma U.S., Inc., Arkema Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Chemdesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, The Chemours Company, The Chemours Company FC, LLC, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont De Nemours, Inc., Dynax Corporation, E. I. Du Pont de Nemours and Company, Kidde PLC, Inc., National Foam, Inc., Nation Ford Chemical Company, Raytheon Technologies Corporation, Tyco Fire Products, LP (individually and as successor-in-interest to The Ansul Company), and UTC Fire & Security Americas Corporation, Inc.  Plaintiff hereby alleges, upon information and belief, as follows:

## SUMMARY OF THE CASE

1.      Plaintiff Daniel Frias brings this action against Defendants who manufactured aqueous film-forming foam ("AFFF"), exposure to which resulted in his serious personal injuries.

2.      Mr. Frias has been employed by and works at a facility owned and operated by JSR, Inc., a general contractor, where he was exposed to high levels of per- and polyfluoroalkyl substances ("PFAS"). Plaintiff is informed and believes PFAS was present in the drinking water at the JSR, Inc. facility due to use of aqueous film-forming foam ("AFFF") which contained PFAS including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS").

3.      PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are

2

firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

4.    PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.  PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

5.    At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluourinated chemicals contained in AFFF.

6.    This Complaint refers to AFFF, PFOA, PFOS, PFAS compounds, and fluorosurfactants collectively as "Fluorosurfactant Products."

7.    Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the knowledge that firefighters would be exposed to these toxic compounds during fire protection, training, and response activities even when the AFFF was used as directed and intended by the manufacturer.

8.    Plaintiff files this lawsuit to recover compensatory and all other damages, including but not limited to past and future (1) expenses for care, treatment and hospitalization incident to the injury;  (2) compensation for physical pain and suffering;  (3) loss of income, wages, or earning capacity; (4) compensation for mental or emotional pain and anguish; (5)

physical impairment; (6) loss of companionship and society; (7) inconvenience; (8) loss of enjoyment of life; (9) exemplary damages.

## PARTIES

### A.    PLAINTIFF

9.    Daniel Frias is a resident of Adkins, Texas. From September 2006 to today, Plaintiff has been employed by JSR, Inc., a general contracting firm with primary offices at 8834 Graves Lane, Schertz, Texas. The well water JSR's facility, where Plaintiff has worked since 2006, is contaminated with PFAS at over 1,000 ppt. Plaintiff consumed and washed his hands with the well water at JSR's facility on a daily basis for the entirety of his employment. Plaintiff is informed and believes that the well water contamination at JSR's facility is due to the use of AFFF at nearby Randolph Air Force Base.

10.    In May 2024, Plaintiff was diagnosed with kidney cancer. Plaintiff subsequently had his left kidney removed, and is undergoing ongoing treatment related to his cancer diagnosis. PFAS was found to be present in Plaintiff's blood.

### B.    DEFENDANTS

11.    Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products to which Plaintiff was exposed.

12.    **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF

containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

13.     3M is the only company that manufactured and/or sold AFFF containing PFOS.

14.     **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

15.     **AGC AMERICA:** Defendant AGC Chemical Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

16.     **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

17.     **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

18.     **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

5

19.     **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

20.     **CARRIER:** Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

21.     **CHEM INC.:** Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

22.     **CHEMDESIGN:** Defendant Chemdesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

23.     **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

24.     **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

25.     In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened

with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

26.    **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company that conducts business throughout the United States. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

27.    **CHUBB:** Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to Chubb Fire & Security Ltd., Chubb Security, P.L.C., Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls & Security, a unit of United Technologies Corporation.

28.    **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

29.    **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

30.    **DEEPWATER:** Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

31. **DUPONT:** Defendant E. I. Du Pont De Nemours and Company ("DuPont") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

32. **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a DowDuPont, Inc.) is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont.

33. Upon information and belief, Corteva was originally formed in February 2018 as a wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

34. Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc., DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

35. **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

36. **KIDDE PLC:** Defendant Kidde P.L.C., Inc. ("Kidde P.L.C.") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington,

Connecticut 06032. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

37.    **NATIONAL FOAM:** Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus Fire brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). This Defendant manufactured and sold AFFF that contained PFOA.

38.    **NATION FORD:** Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

39.    **RAYTHEON TECHNOLOGIES CORP.:** Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032.

40.    **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

41.    Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange

42.    Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times

relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

43.    **UTC:** Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. UTC was a subsidiary of United Technologies Corporation.

44.    Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of Fluorosurfactant Products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

45.    All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of Texas.

46.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

47.    The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission or failed to adequately supervise or properly control or direct their employees while engaged in the

management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

48.    Plaintiff seeks damages in an amount in excess of the minimum jurisdictional limits of this Court. The amount in controversy exceeds twenty-five thousand dollars ($25,000,00).

49.    Plaintiff is a Texas resident, and at least one Defendant is either a Texas corporation or keeps a principal place of business in Texas.

50.    Venue is proper in Hays County, Texas, under Section 15.002(a)(1) of the Civil Practice & Remedies Code, because a substantial part of the events or omissions giving rise to the claim occurred in this County.

51.    This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in Texas, or otherwise intentionally avails itself of the Texas market either through the distribution or sale of products containing PFAS in the State of Texas or by having a manufacturing, distribution or other facility located in Texas so as to render the exercise of jurisdiction over it by the Texas courts consistent with traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

### A.    THE CONTAMINANTS: PFOA & PFOS

52.    PFOA and PFOS are stable manmade chemicals in a family as PFAS.  Each is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group.  The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these

molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

53.    PFOA and PFOS do not occur in nature. Rather, they are stable, man-made chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation.

54.    PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure, dermal exposure, or inhalation, and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air, as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[1]

55.    PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[2]

56.    Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

57.    According to the EPA, "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[3]

---

[1] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document No. 822-R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed May 8, 2023); *see also* EPA, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)*, EPA Document Number: 822-R-16-005 at 16, available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100OM4O.txt (last accessed May 8, 2023).

[2] *See id.*

[3] *See* EPA, *Fact Sheet PFOA & PFOS Drinking Water Health Advisories*, EPA Document Number: 800-F-16-003, available at available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100OR9W.txt (last accessed May 8, 2023).

58.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[4]

59.     EPA continues to research the effects of PFAS.  In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt).  EPA announced new Interim Updates Health Advisory levels of 0.004 ppt for PFOA and 0.02 ppt for PFOS.[5]

60.     The use of Fluorosurfactant Products as directed and intended by the manufacturers caused Plaintiff's exposure to PFOA and PFOS, which caused Plaintiff's personal injuries.

## B.    AQUEOUS FILM-FORMING FOAM

61.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires.  It is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion. AFFF is typically sprayed directly onto a fire.

62.     The AFFF products made by Defendants contained either or both PFOA and PFOS.

---

[4] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed May 8, 2023).

[5] EPA, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)*, EPA Document Number 822-F-22-002, available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P10154ST.txt (last accessed May 8, 2023).

63.    The AFFF produced, marketed and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.

64.    Upon information and belief, from 1960s through the mid-2000s, 3M manufactured, designed, marketed, distributed, and sold AFFF containing PFOS, PFOA, and/or their chemical precursors within the United States and raw materials containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

65.    All other Defendants used telomerization to produce AFFF; fluorochemicals made through telomerization degrade into PFOA, but not PFOS.

66.    Upon information and belief, by the early 1970s, National Foam and Tyco/Ansul began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States.

67.    Upon information and belief, by the 1980s, Chemguard began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States, and fluorosurfactants containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

68.    Upon information and belief, by the 1990s, Buckeye began to manufacture, design, market, and/or sell AFFF containing PFOA and/or its chemical precursors withing the United States.

69.    When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to the foam (including firefighters).  When using AFFF, firefighters may absorb PFOA and PFOS

through their skin, inhale PFOA and PFOS compounds, or inadvertently ingest PFOA and PFOS compounds.

70.    PFOA & PFOS accumulate in the human body and may cause serious injuries.

71.    AFFF can be made without PFOA and PFOS. Unlike AFFF made with PFOA or PFOS, fluorine-free foams do not pose a significant health threat to firefighters.

### C.    DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS

72.    On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when AFFF was used per the instructions given by the manufacturer, firefighters would be exposed to PFOA and PFOS at levels sufficient to cause harm to human health.

73.    Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the skin, lungs, and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

74.    In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years.  Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from the body after all exposures had ceased.[6]

75.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects.  Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

---

[6] *See* Office of Minnesota Attorney General, Exhibit List, No. 1588, Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1588.pdf (last accessed May 8, 2023).

76.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia.  DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect and one a nostril and eye defect.[7]

77.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[8]

78.     Based on information and belief, in 2000, under pressure by the Environmental Protection Agency ("EPA"), 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

79.     After 3M exited the AFFF market in the United States, the remaining AFFF manufacturer Defendants continued to manufacture and sell AFFF containing PFOA and/or its chemical precursors.

80.     From 1951 onward, Dupont, and on information and belief, Chemours, designed, manufactured, marketed, and sold products containing PFOA, including Teflon nonstick cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

---

[7] *See* DuPont, *C-8 Blood Sampling Results,* available at
https://static.ewg.org/files/PFOA_013.pdf?_gl=1*anldwl*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21G
C49KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0MC4wLjAuMA..&_ga=2.26293428.885409355.16835878
69-581783177.1682689989 (last accessed May 8, 2023).

[8] *See* 3M, Internal Memorandum, *Organic Fluorine Levels,* (August 31, 1984), available at
https://static.ewg.org/files/226-
0483.pdf?_gl=1*1u237yp*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC49KT*MTY4MzU4Nzg2OC
4yLjEuMTY4MzU4Nzk0MC4wLjAuMA..&_ga=2.39402538.885409355.1683587869-581783177.1682689989
(last accessed May 8, 2023).

81.    Based on information and belief, in 2001 or earlier, Dupont manufactured, produced, marketed, and sold PFOA and/or PFAS feedstocks to some or all of the AFFF product manufacturers, which were included in their AFFF products that were discharged into the environment and harmed Plaintiff.

82.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[9]

83.    By December 2005, the E.P.A. uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the E.P.A. announced the "Largest Environmental Administrative Penalty in Agency History."  The E.P.A. fined DuPont $16,500,000 for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the E.P.A. substantial risk information about chemicals they manufacture, process, or distribute in commerce."[10]

84.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture.  The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[11] between PFOA

---

[9] EPA, Consent Agreement and Final Order, *In re E.I. DuPont de Nemours & Co.*, TSCA Docket TSCA-HQ-2004-0016 (Dec. 14, 2005), available at https://www.epa.gov/sites/default/files/documents/dupontpfoasettlement121405.pdf (last accessed May 8, 2023).

[10] *Id.*

[11] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.  *See* C8 Panel, *C8 Probable Link Reports*, available at http://www.c8sciencepanel.org/prob_link.html (last accessed May 8, 2023).

exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[12]  By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

85.     In July 2015, E.I. du Pont de *Nemours* spun off its *chemicals* division, creating *Chemours*, a new publicly-traded company named The Chemours Company, once wholly owned by DuPont.  By mid- 2015, DuPont had dumped its perfluourinated chemical liabilities into the lap of the new Chemours Company.

86.     Defendants also knew or should have known that: (a) users of AFFF would likely include fire and rescue training organizations and their personnel; (b) fire and rescue personnel were foreseeable users of AFFF containing or degrading into PFOA and/or PFOS in both training and real-life fire emergency scenarios; (c) PFOA and PFOS are dangerous to the environment and human health when used by fire and rescue personnel; (d) fire and rescue personnel foreseeably lacked knowledge of these dangers; and, (e) fire and rescue personnel would require warnings of these dangers and/or affirmative instructions in the use of AFFF.

87.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, purchased, supplied, and/or sold PFOA/PFOS; (2) issued instructions on how AFFF should be used and disposed of; (3) failed to recall and/or warn the users of AFFF of the dangers to human health that result from the standard use and disposal of these products; negligently designed products containing or degrading into PFOA and/or PFOS; and (5) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF

---

[12] *See* C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), available at
http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf  (last accessed May 8, 2023).

containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFOA/PFOS.

88.     As a direct result of Defendants' acts alleged in this Complaint, Plaintiff suffered severe health effects caused by exposure to AFFF containing PFOA and/or PFOS.  As a direct and proximate result, Plaintiff and his beneficiaries incurred substantial harm, both economic and non-economic.

89.     Defendants had a duty and breached their duty to evaluate and test such products adequately and thoroughly to determine their potential human health impacts before they sold such products. They also had a duty and breached their duty to minimize the risk of harm to human health caused by PFOA and PFOS.

### D.     OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM PFAS LIABILITIES

90.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

91.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

92.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

93.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

94.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

95.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

96.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

97.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

98.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

99.    Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

100.    Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

101.    In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

102.    Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

103.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

104.    Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

105.    Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related

to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

### E.    THE IMPACT OF PFOA AND PFOS ON THE PLAINTIFF

106.    From September 2006 to today, Plaintiff has been employed by JSR, Inc., a general contracting firm with primary offices at 8834 Graves Lane, Schertz, Texas.  The well water JSR's facility, where Plaintiff has worked since 2006, is contaminated with PFAS at over 1,000 ppt. Plaintiff consumed and washed his hands with the well water at JSR's facility on a daily basis for the entirety of his employment.   Plaintiff is informed and believes that the well water contamination at JSR's facility is due to the use of AFFF at nearby Randolph Air Force Base.

107.    Plaintiff has been diagnosed with kidney cancer, and subsequently had his kidney removed as a direct result of the cancer diagnosis.  PFAS has been found in Plaintiff's blood.

108.    Plaintiff's cancer weas caused by Defendants' Fluorosurfactant Products.

109.    The use of Fluorosurfactant Products as directed and intended by the manufacturers caused Plaintiff's exposure to PFOA and PFOS, which caused Plaintiff's injuries.

110.    Therefore, as a direct and proximate result of Defendants' tortious conduct as discussed in this complaint, Plaintiff was damaged in the following ways:

a.    Mr. Frias suffered physical pain and mental anguish;

b.    Mr. Frias incurred hospital, medical, pharmaceutical and other expenses;

c.    Mr. Frias experienced undue stress related to his diagnosis, medical condition, and uncertainty about his prognosis.

d.    Mr. Frias will continue to suffer – and incur additional costs – for the foreseeable future as a result of his cancer diagnosis and subsequent kidney removal.

## FIRST CAUSE OF ACTION – GENERAL NEGLIGENCE

111.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

112.    As manufacturers and sellers of PFAS-containing products and/or AFFF, Defendants owed a duty to Plaintiff and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing products and/or AFFF.

113.    Defendants knew or should have known that PFOA and/or PFOS were leaching from PFAS-containing products and/or AFFF used as foreseen and intended.

114.    Despite the fact that Defendants knew that PFOA and PFOS are toxic and may cause disease in humans, Defendants negligently:

    a.    designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS-containing products and/or AFFF;

    b.    issued instructions on how PFAS-containing products and/or AFFF should be used, handled, and disposed of, thus improperly permitting Plaintiff's exposure to PFOA and/or PFOS;

    c.    failed to properly test PFAS-containing products and/or AFFF before they were released for consumer use;

    d.    failed to recall and/or warn the users of PFAS-containing products and/or AFFF of the dangers to human health that result from the standard use and disposal of this product; and,

    e.    failed and refused to issue the appropriate warning and/or recalls to the users of PFAS-containing products and/or AFFF notwithstanding the fact that

Defendants know the identity of the purchasers of the PFAS-containing products.

115.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered personal injuries and suffered costs and damages resulting therefrom.

116.    Defendants knew or should have known that it was substantially certain that its acts and omissions described above would cause injuries to those in areas where their products were used, handled, or disposed of as intended and instructed.  Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, o malice, and with conscious and/or reckless disregard for the health and safety of users such as Plaintiff.

## SECOND CAUSE OF ACTION – PRODUCT LIABILITY DEFECTIVE DESIGN

117.    Plaintiff realleges and reaffirms  each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

118.    Defendants were in the business of producing, making, fabricating, constructing, designing, marketing, and selling PFAS-containing products and/or AFFF containing PFOA and/or PFOS.

119.    All of Defendants' PFAS-containing products and/or AFFF products were manufactured for placement into trade or commerce.

120.    Defendants marketed and/or sold AFFF for use in controlling and extinguishing aviation, marine, fuel and other shallow spill fires, as well as for the training associated with such uses.

121.    Defendants knew that when used as intended and directed, AFFF would cause harm similar to that suffered by Plaintiff.

122.    Plaintiff was unaware of the hazards and defects in AFFF products which made them unsafe.

123.    During the time when Plaintiff was exposed to PFOA and PFOS from AFFF, AFFF was being used in a manner which was intended by Defendants.

124.    Defendants knew of these risks associated with PFAS, including PFOA and PFOS in AFFF, and failed to use reasonable care in the design of their PFAS-containing products and/or AFFF products.

125.    At all times, Defendants were capable of making PFAS-containing products and/or AFFF that did not contain PFOA/PFOS.  Reasonable alternative designs existed which were capable of preventing Plaintiff's damage.  These alternative designs were both economically and technologically feasible at the time the products were released from Defendants' control.

126.    The risks posed by PFAS-containing products and/or PFOA/PFOS-containing AFFF far outweigh the products' utility.  A safer design of AFFF — one not utilizing PFOA or PFOS — would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

127.    The likelihood that PFAS-containing products and/or AFFF would cause injuries to Plaintiff far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

128.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PFAS-containing products and/or AFFF, Plaintiff suffered personal injuries as discussed throughout this Complaint.

129.    Defendants knew that it was substantially certain that their acts and omissions described above would threaten the health of users like Plaintiff.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or

malice, and with conscious and/or reckless disregard for the health and safety of others, and for the Plaintiff's health.

### THIRD CAUSE OF ACTION - PRODUCTS LIABILITY FAILURE TO WARN

130.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

131.    PFAS-containing products and/or AFFF are unreasonably dangerous for their reasonably anticipated uses such that a risk of harm is inherent for the following reasons:

> a.    Users of AFFF are exposed to PFOA and PFOS when AFFF is used, handled, or disposed of in its foreseeable and intended manner;
>
> b.    PFOA and PFOS exposure  may cause diseases and cancers like Plaintiff's; and
>
> c.    PFOA and/or PFOS pose significant threats to human and environmental health.

132.    At all relevant times, including the time AFFF products were marketed, Defendants knew of or should have reasonably foreseen the environmental and human health risks associated with PFAS-containing products and/or AFFF, and Defendants failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PFAS-containing products and/or or an instruction that would have prevented the harm to Plaintiff.

133.    Despite Defendants' knowledge of environmental and human health hazards associated with the use, storage, and/or disposal of PFAS-containing products and/or AFFF, Defendants failed to issue any warnings, instructions, recalls, or advice regarding PFAS-containing products and/or AFFF to local fire departments, other governmental agencies, or the public.  This failure constitutes a marketing defect and renders AFFF products unreasonably dangerous to those harmed by the use of the product including Plaintiff.

134.    Although Defendants were aware of the dangers posed by AFFF products, the dangers were unknown and not foreseeable to Plaintiff.

135.    As a direct and proximate result of Defendants' failure to warn, Plaintiff suffered personal injuries and costs and damages resulting therefrom.

136.    The Defendants' failure to warn constitutes a causative nexus in Plaintiff's injuries.

137.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten the health of users like Plaintiff.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others and for the Plaintiff's health.

## FOURTH CAUSE OF ACTION - GROSS NEGLIGENCE

138.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

139.    The actions and inactions of Defendants and their predecessors-in-interest, as specifically alleged hereinabove, whether taken separately or together, and viewed objectively from Defendants' perspective at the time of Defendants' acts or omissions, were of such a character as to constitute objective knowledge that there would be an extreme degree that firefighters would be unknowingly exposed, consistently and repeatedly, to PFOA and PFOS through inhalation, ingestion, and dermal contact when using and handling AFFF as intended and instructed.

140.    Defendants' corporate officers had actual subjective awareness of the inherent risks associated with this conduct but proceeded in conscious indifference to the rights, safety and welfare of users including Plaintiff.

141.    Defendants and their predecessors-in-interest knowingly proceeded in this conscious indifference for decades.

142.    Because of this willful and wanton disregard to the safety of product users including Plaintiff, Defendants should be held liable for punitive and exemplary damages for the irreparable physical injuries and damages to Plaintiff.

## FIFTH CAUSE OF ACTION FRAUDULENT TRANSFER

(Against DuPont and Chemours)

143.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

144.    Plaintiff seeks equitable and other relief pursuant to the Texas Uniform Fraudulent Transfer Act against DuPont.

145.    Prior to and during 2015, Defendant Dupont was in the business of producing, making, fabricating, designing, marketing, and selling chemical feedstocks containing PFOA and/or chemicals that can degrade into PFOA and/or other PFAS as part of their "performance chemicals business."

146.    Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off Dupont's "performance chemicals business" products line in July 2015.

147.    In addition to the transfer of the "performance chemicals business" products line, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFOA and other PFAS.

148.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture, design, marketing and sale of PFOA or other PFAS components for the use in AFFF products.

149.     As a result of the transfer of assets and liabilities to Chemours described in this Complaint, DuPont limited the availability of assets to cover judgements for all liability for damages and injuries from the manufacture, design, marketing, sale of PFOA or other PFAS components for the use in AFFF products.

150.     DuPont has (a) acted with intent to hinder, delay and defraud creditors, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably insufficient in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

151.     Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of creditors, such as Plaintiff, that have been damaged as a result of DuPont's actions as described in this Complaint.

152.     Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

153.     Plaintiff seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded against Chemours by this Court or a jury under this Complaint.

## PRAYER FOR RELIEF

154.     Plaintiff respectfully prays for judgment against Defendants, jointly and severally, as follows:

a.  Compensatory damages and all other special damages according to proof including, but not limited to past and future medical and treatment costs; non-economic damages; loss of earnings and future earnings; and household expenses, among others.

b.  Avoiding the transfer of DuPont's liabilities for claims brought in this Complaint;

c.  Exemplary and Punitive damages;

d.  Attorney's fees;

e.  Pre-judgment and post-judgment interest;

f.  In the event that one or more Defendant is found to be greater than 50% responsible pursuant to Tex. Civ. Practice & Remedies Code §33.013, a finding of joint and several liability;

g.  Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a jury trial.

Dated:  October 3, 2024

/s/  *Brett Land*
**BARON & BUDD, P.C.**
Scott Summy (TX Bar 19507500)
Carla Burke Pickrel (TX Bar 24012490)
Brett Land (TX Bar 24092664)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX   75219-4281
Telephone:  (214) 521-3605

**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
Philip F. Cossich, Jr. (LA Bar 1788)
(*Pro Hac Vice* pending)
Louise R. Caro (FLA Bar 633380)
(*Pro Hac Vice* pending)
8397 Highway 23, Suite 100

Belle Chasse, LA 70037
(504) 394-9000

***Attorneys for Plaintiff***